IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CIVIL ACTION NO. 18-3087 |
|---|---|---|
| v. | : | |
| PETERLY NETUS | : | CRIMINAL ACTION NO. 17-172 |

## MEMORANDUM

**Padova, J.**  November 13, 2018

Before the Court is Defendant Peterly Netus's *pro se* Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255. Netus asks that we vacate his conviction and sentence in its entirety. He raises two grounds for relief based on the alleged ineffectiveness of his trial counsel. For the following reasons, we deny the § 2255 Motion.

**I. BACKGROUND**

On June 7, 2017, Netus pled guilty pursuant to a written Guilty Plea Agreement to Counts I-IV of Indictment No. 17-172, which charged him with one count of conspiracy to defraud the United States by filing false claims, in violation of 18 U.S.C. § 286, and three counts of submitting false claims, in violation of 18 U.S.C. § 287, and aiding and abetting, in violation of 18 U.S.C. § 2. The charges arose from Netus's participation in a conspiracy to defraud the United States by obtaining and aiding others in obtaining federal income tax refunds by presenting fraudulent tax returns to the Internal Revenue Service ("IRS"). As part of his Guilty Plea Agreement, Netus stipulated that the fraud loss caused in furtherance of the conspiracy totaled $81,666.18; that this amount was within the scope of his agreement and was reasonably foreseeable to him in connection with the conspiracy; and that his advisory Guidelines sentence range should be calculated based on that amount. (Guilty Plea Agreement ¶ 9(a).) The Guilty Plea Agreement also provides that Netus, who is not a citizen of the United States, understands that his guilty plea "will result in his

being subject to immigration proceedings and will likely result in his being removed from the United States, denied citizenship, and denied admission to the United States in the future." (Id. ¶ 10.)

On September 19, 2017, Netus was sentenced to two months of imprisonment, three years of supervised release, a special assessment of $400.00, and restitution in the amount of $81,666.18. He did not appeal his conviction or sentence. Netus has served his sentence of imprisonment and is presently in the custody of the United States Department of Homeland Security, Immigration and Customs Enforcement, awaiting the decision of an Immigration Judge as to his removability.

In the instant § 2255 Motion, Netus asks us to vacate his conviction as to all four Counts because his attorney provided him with ineffective assistance in connection with his decision to plead guilty in violation of his rights under the Sixth Amendment. The § 2255 Motion asserts two grounds for relief: (1) Netus's attorney was ineffective in that he failed to properly advise Netus of the immigration consequences of his guilty plea, and (2) Netus's attorney was ineffective in that he failed to sufficiently explain the offense to which Netus pled guilty in Count I. Netus maintains that, if his attorney had properly advised him, he would not have pled guilty.

## II.  LEGAL STANDARD

Netus has moved for relief pursuant to 28 U.S.C. § 2255, which provides as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). "'Section 2255 does not provide habeas petitioners with a panacea for all alleged trial or sentencing errors.'" United States v. Perkins, Crim. A. No. 03-303, Civ. A. No.

07-3371, 2008 WL 399336, at *1 (E.D. Pa. Feb. 14, 2008) (quoting United States v. Rishell, Crim. A. No. 97-294-1, Civ. A. No. 01-486, 2002 WL 4638, at *1 (E.D. Pa. Dec. 21, 2001)). In order to prevail on a Section 2255 motion, the movant's claimed errors of law must be constitutional, jurisdictional, "a fundamental defect which inherently results in a complete miscarriage of justice," or "an omission inconsistent with the rudimentary demands of fair procedure." Hill v. United States, 368 U.S. 424, 428 (1962); see also United States v. Travillion, 759 F.3d 281, 288 (3d Cir. 2014) (stating that "relief under § 2255 is available only when 'the claimed error of law was a fundamental defect which inherently results in a complete miscarriage of justice, and . . . present[s] exceptional circumstances where the need for the remedy afforded by the writ . . . is apparent.'" (alterations in original) (quoting Davis v. United States, 417 U.S. 333, 346 (1974))).

### III. DISCUSSION

#### A. Ineffective Assistance of Counsel

Both of Netus's claims are based on the alleged ineffectiveness of his attorney in connection with his decision to plead guilty. In order to prevail on a claim for ineffective assistance of counsel, a criminal defendant must demonstrate both that (1) his attorney's performance was deficient, *i.e.*, that the performance was unreasonable under prevailing professional standards, and (2) that he was prejudiced by his attorney's performance. Strickland v. Washington, 466 U.S. 668, 687-88, 690-92 (1984). "We may address the prejudice prong first '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice.'" Travillion, 759 F.3d at 289 (alteration in original) (quoting Strickland, 466 U.S. at 697). Prejudice is proven if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

3

"Before deciding whether to plead guilty, a defendant is entitled to 'the effective assistance of competent counsel.'" Padilla v. Kentucky, 559 U.S. 356, 364 (2010) (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970); and citing Strickland, 466 U.S. at 686). Consequently, "[w]hen addressing a guilty plea, counsel is required to give a defendant enough information 'to make a reasonably informed decision whether to accept a plea offer.'" United States v. Bui, 795 F.3d 363, 367 (3d Cir. 2015) (alteration in original) (quoting Shotts v. Wetzel, 724 F.3d 364, 376 (3d Cir. 2013)). In order to establish prejudice "[i]n the context of a guilty plea," a defendant must show "'that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" United States v. Fazio, 795 F.3d 421, 426 (3d Cir. 2015) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)). However, "[c]ourts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." Lee v. United States, -- U.S. --, 137 S. Ct. 1958, 1967 (2017).

B. The Immigration Consequences of Defendant's Guilty Plea

In his first ground for relief, Netus argues that we should vacate his conviction because the information that his attorney provided to him regarding the immigration consequences of pleading guilty was constitutionally deficient. The Supreme Court held in Padilla that because of "the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country," a defendant's attorney must inform the defendant "whether his plea carries a risk of deportation." 559 U.S. at 374. Thus, "'when the deportation consequence is truly clear,' as it was in Padilla's case because he had committed a removable offense, 'the duty to give correct advice is equally clear.'" Fazio, 795 F.3d at 427

4

(quoting Padilla, 559 U.S. at 369). "Padilla was entitled to be 'advised . . . that his conviction for drug distribution made him subject to automatic deportation,' and his defense counsel's failure to meet this requirement was constitutionally deficient representation under the first prong of Strickland." Id. (alteration in original) (quoting Padilla, 559 U.S. at 360).

Netus maintains that, because he pled guilty to a conspiracy to defraud the United States with a loss of more than $10,000.00, his conviction made him subject to mandatory deportation.[1] He argues that his attorney was ineffective because he only informed Netus that "there might be deportation" and stated that "he did not think that there would be deportation if [Netus pled] guilty." (Netus Aff. ¶¶ 3-4 (internal quotation marks omitted).) Netus's attorney denies that he failed to advise Netus regarding the immigration consequences of his guilty plea and maintains that he advised Netus that "in all likelihood he would be deported." (Adamo Aff. ¶ 2.) However, we need not resolve this factual dispute and determine whether his attorney's advice was constitutionally deficient under Strickland if Netus was not prejudiced by the advice he claims he was given. See Travillion, 759 F.3d at 289 (quoting Strickland, 466 U.S. at 697).

The United States Court of Appeals for the Third Circuit concluded in Fazio that an attorney's failure to sufficiently advise a defendant of the immigration consequences of a guilty

---

[1] The Supreme Court recognized in Padilla that, "[u]nder contemporary law, if a noncitizen has committed a removable offense after the 1996 effective date of [certain amendments to the Immigration and Nationality Act], his removal is practically inevitable . . . ." Padilla, 559 U.S. at 363-64 (citing 8 U.S.C. § 1229b); see also id. at 366 (stating that "recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders"). Accordingly, Padilla states that the deportation of individuals convicted of removable offenses is "presumptively mandatory." Id. at 369. Netus was convicted of an aggravated felony, which makes him removable. See 8 U.S.C. §1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."); see also 8 U.S.C. § 1101(a)(43)(M) (defining an aggravated felony as "an offense that -- (i) involves fraud or deceit in which the loss to the victim or victims exceeds $10,000 . . . "). Thus, under Padilla, his deportation is "presumptively mandatory." Padilla, 559 U.S. at 369.

5

plea could be cured by the information provided to that defendant in his guilty plea agreement and guilty plea colloquy. See 795 F.3d at 427-29. The defendant in Fazio pled guilty to "conspiring to distribute more than 200 grams but fewer than 300 grams of cocaine," which made him subject to "automatic deportation." Id. at 422, 428. The defendant's attorney informed him that "there could be immigration consequences to pleading guilty[,]" but "did not inform [him] that the plea made him subject to automatic deportation" even though that advice "is required under Padilla in cases like Fazio's where the immigration consequences of a guilty plea are clear." Id. at 427 (citation and quotation omitted). However, the defendant's plea agreement stated that he "wanted to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States." Id. at 428 (quotation omitted). In addition, the district court asked the defendant, during his guilty plea colloquy, whether he "want[ed] to plead guilty regardless of any immigration consequences that [his] plea of guilty may entail, even if the consequence is [his] automatic removal from the United States" and the defendant "responded affirmatively." Id. (quotation omitted). The Third Circuit concluded both that "Fazio was entitled to be 'advised . . . that his conviction for drug distribution made him subject to automatic deportation,'" and that "any possible error in plea counsel's advice to Fazio was cured by the plea agreement and at the plea colloquy. Id. (quoting Padilla, 559 U.S. at 360). As the Third Circuit explained, "[b]oth made clear that Fazio was willing to plead guilty even if that plea would lead to automatic deportation, fulfilling the requirement that Fazio be informed of this risk under Padilla." Id. The Third Circuit held, accordingly, "that Fazio did not suffer prejudice as a result of any deficient performance by his counsel during the plea process and, therefore, Fazio is not entitled to relief on his ineffective-assistance-of-counsel claim." Id. at 429.

Like the defendants in Padilla and Fazio, Netus pled guilty to an aggravated felony, which

6

made him subject to automatic deportation. See supra n.1. Netus claims that his attorney did not inform him that his plea subjected him to automatic deportation. Assuming argumendo that Netus's account of the advice he was given is accurate, we look to his Guilty Plea Agreement and guilty plea colloquy to determine if he was prejudiced by his attorney's asserted failures. Netus's Guilty Plea Agreement contains the following information regarding the immigration consequences of his decision to plead guilty to Counts I-IV of the Indictment:

> The defendant, who is not a citizen of the United States, understands that his guilty plea in this case will result in his being subject to immigration proceedings, and will likely result in him being removed from the United States, denied citizenship, and denied admission to the United States in the future. The defendant has discussed with his attorney the immigration consequences of his guilty plea. The defendant understands that the immigration consequences of this plea will be determined in a separate proceeding before the immigration authorities, and that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. **The defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences of his plea, even if the result is his removal from the United States.**

(Guilty Plea Agreement ¶ 10 (emphasis added).) In addition, the Assistant United States Attorney read that portion of the Guilty Plea Agreement aloud during Netus's guilty plea colloquy and Netus agreed that he understood that those terms were part of his plea agreement. (6/7/17 Hr'g Tr. at 11-12, 14-15.) Netus also confirmed, during his guilty plea colloquy, that he had read the terms of his Guilty Plea Agreement, that he had discussed them with his attorney, and that he understood them. (Id. at 7-8.) He also identified his signature on the Guilty Plea Agreement. (Id. at 8.) We conclude that the language contained in Netus's Guilty Plea Agreement and repeated during his plea colloquy, that his guilty plea "will likely result in [his] being removed from the United States" and that "he wants to plead guilty regardless of any immigration consequences of his plea, even if the result is his removal from the United States" is functionally equivalent to the language used in Fazio's guilty plea agreement and plea colloquy that Fazio "wanted to plead guilty regardless of

7

any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States." Fazio, 795 F.3d at 428.

Given that functional equivalence, we conclude, as the Fazio court did, that "any possible error in counsel's advice . . . was cured by the plea agreement and the plea colloquy." Id. Accordingly, we hold that Netus has failed to demonstrate that his attorney's alleged ineffectiveness was prejudicial, and we deny the instant Motion with respect to Netus's argument that his attorney was constitutionally ineffective in that he failed to advise him that his conviction made him subject to automatic deportation.

C. Count I of the Indictment

Netus argues that his conviction as to Count I of the Indictment should be vacated because his attorney was ineffective in that he did not advise Netus of the basis of the offense charged in Count I of the Indictment, so that his plea of guilty to Count I was not knowing or intelligent. Netus maintains that he did not commit the crime alleged in Count I and he states that he believed, when he pled guilty to Count I, that it only charged him with conspiracy to commit Counts II through IV of the Indictment.[2] Netus's argument is, however, belied by his guilty plea colloquy.

Netus affirmed, during his guilty plea colloquy, that he understood the essential elements of the offense charged in Count I. (6/7/17 Hr'g Tr. at 19-20.) In addition, he confirmed that the following facts summarized by the Government accurately described his conduct with respect to Count I of the Indictment:

> [The AUSA]: . . . Mr. Netus engaged in . . . what we call stolen income refund fraud conspiracy with an individual named Mark Celestin and a number of other

---

[2] Netus contends that he was prejudiced by his attorney's conduct because, if he had been properly informed of the offense charged in Count I, he would not have pled guilty to that Count, but would have instructed his attorney to inform the Government that he was willing to plead guilty to Counts II through IV. However, the Government maintains that it would not have accepted an offer to plead guilty to only Counts II through IV.

co-conspirators and essentially, what he did is after Mark Celestin filed false tax returns in the name -- using the names of stolen identities, Mr. Netus opened two bank accounts both at Citizen's Bank. He did this in approximately March/April of 2012 and he opened two bank accounts in the name of Netus Multi Services at Citizen's Bank. He opened these accounts for the sole purpose of receiving stolen refunds from the IRS that were based on the fraudulent returns filed by Mark [Celestin] and others.

He had control over these accounts. He was the only signatory. He's the one who withdrew all of the money from those accounts and approximately a total of 31 refunds -- checks -- amounts totaling $40,139 were sent by direct deposit into one of the Citizen's Bank accounts and a total of 31 other tax refunds totaling $41,527 were direct deposited into the other Citizen's Bank account he opened.

After they were -- the false returns were deposited, Mr. Netus withdrew those funds through a variety of methods. The total amount of stolen refunds that he withdraw [sic] was $81,666.18. Now, he admits that he opened those accounts and he says that he received 30 percent of the proceeds from Mark [Celestin]. Additionally --

THE COURT: So all the money went in, he kept 30 percent and distributed the others to other members of the conspiracy.

[THE AUSA]: Yes.

THE COURT: Okay.

[THE AUSA]: He admitted the crime. And finally, Your Honor, with respect to the victims in terms of the individuals whose identities were used, the agents have interviewed at least three of those individuals and they all have confirmed, and they constitute Counts 2, 3, and 4, and they all have confirmed they don't know Mr. Netus or Mark [Celestin]. They never authorized anyone to file any tax return in their name for those particular years. And, Your Honor, they're all similar. They all have the same false credits and deductions.

THE COURT: Thank you counsel. Has the Government accurately summarized those facts:

THE DEFENDANT: Yes.

(Id. at 20-22.)

Since Netus agreed, during his guilty plea colloquy, that his offense conduct in connection with the conspiracy involved 62 refund checks, we find that Netus understood, at the time he pled guilty to Count I, that Count I involved the filing of more than just the three false claims that

9

resulted in refund checks charged in Counts II – IV. See Lee, 137 S. Ct. at 1967 (instructing judges to "look to contemporaneous evidence" regarding a defendant's decision to plead guilty). We further find that Netus admitted to conduct that satisfies the elements of the conspiracy charged in Count I of the Indictment. Accordingly, we conclude that, even if Netus's attorney did not sufficiently advise him of the offense to which he pled guilty in Count I, any resulting prejudice was cured by his guilty plea colloquy, specifically, the Assistant United States Attorney's summary of the essential elements of the crime of conspiracy to defraud the United States with respect to claims charged in Count I of the Indictment and the Assistant United States Attorney's summary of the factual basis of his plea. See Fazio, 795 F.3d at 428 (concluding that "any possible error in plea counsel's advice to [the defendant] was cured by the plea agreement and at the plea colloquy"). Accordingly, we conclude that Netus has failed to demonstrate that his attorney's alleged ineffectiveness was prejudicial, and we deny the instant Motion with respect to Netus's argument that his attorney was constitutionally ineffective in that he failed to advise him of the basis of Count I of the Indictment.

## IV. CONCLUSION

For the reasons stated above, we deny Netus's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 in its entirety. An appropriate order follows.

BY THE COURT:

/s/ John R. Padova
_____
John R. Padova, J.